FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA   97 APR 24  PM 3: 36
MIDDLE DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| TAMMY GRIFFIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF GLENCOE, ALABAMA, | ) |
| | ) |
| ·Defendant. | ) |

CV-96-PT-1395-M

ENTERED

APR 2 4 1997

## MEMORANDUM OPINION

This cause comes on to be heard on the defendant's Motion for Summary Judgment filed on February 11, 1997.

### BACKGROUND

The plaintiff, Tammy Griffin, alleges that the defendant unlawfully discriminated against her because of her gender in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000(e) *et seq.*, as amended by the Civil Rights Act of 1991. She further alleges that such conduct led to her constructive discharge. The background of this case is convoluted and will necessarily be addressed at length. As always, the court will view the evidence and any reasonable inferences from it in a light most favorable to the plaintiff.

The City of Glencoe, Alabama hired Tammy Griffin (Griffin) as a part-time police dispatcher in June 1994.[1]   Griffin alleges that many persons at the police station harassed her because of her gender. The first incident concerns Griffin's experiences with a Glencoe police officer. One night, the department scheduled reserve officer Lucien Berry to ride with Assistant

---

[1] When Glencoe hired Griffin, all dispatchers were part-time employees. On December 13, 1994, the Glencoe City Council created three full-time dispatcher positions. These positions were to be filled by the existing part-time dispatchers on a seniority basis. Glencoe's mayor and city council make final hiring decisions for the police department after receiving recommendations from the police chief.

1



Police Chief Johnny Chambers (Officer Chambers).[2]  Officer Berry purportedly flirted with and told obscene jokes to Griffin against her will.  At some point during their conversation, Officer Berry told Griffin that another police force had fired him for having an affair with a dispatcher.  Officer Berry further suggested that Officer Chambers and a dispatcher in the Glencoe Police Department were having an affair.  When Griffin expressed her displeasure with such a situation, Officer Berry purportedly said, "So I take it you wouldn't mess around with me even if I asked you."  Griffin replied that she was married and did not have affairs.

Another time,[3] Officer Berry remained at the station in Griffin's work area for several hours after his shift began.  Berry apparently said that he was at the station instead of on patrol because Officer Chambers and dispatcher Cook were together while Chambers was on duty.  At some point, Berry referenced a female on television and purportedly said, "Boy, she's hot.  I like her.  You look a lot like her.  Boy, what I could do to her."  Griffin later complained to Chambers about Berry's conduct.  He purportedly laughed and told Griffin to ignore Officer Berry.  Griffin then told Officer Berry to leave her alone.  Griffin testified that Berry then left and went on patrol with Chambers.  According to Griffin, Officer Berry never bothered her again.

The next incident involves Griffin and City Council Member Butch White.  She asserts that White entered the police station one evening at 1:00 a.m. claiming that he could not sleep.  White purportedly looked at Griffin and "just kind of grinned" at her.  White also discussed Officer Chambers' and dispatcher Cook's alleged affair before telling Griffin that he once dated a dispatcher.  He purportedly told Griffin that "others" made bets that he would have an affair with Griffin.  White also allegedly told Griffin that he had "helped" former Glencoe police dispatcher Candace Warren become City Clerk of Rainbow City, Alabama.[4]  This incident made Griffin uncomfortable.

Griffin also alleges that she suffered sexual harassment because Officer Chambers was

---

[2] Glencoe employs dispatchers and officers on three shifts.  Generally, one dispatcher and one officer work each shift.  Officer Chambers was the dispatcher supervisor at relevant times to this suit.

[3] The record is unclear whether the purported incidents involving Officer Berry transpired on more than one evening.  The court is under the impression that, at most, two evenings are involved.

[4] Warren testified by affidavit that she left her dispatcher job to become *Court* Clerk of Rainbow City and that White did nothing to help her obtain the job.

2

having an affair with dispatcher Cook.[5]  Griffin testified that Officer Chamber's demeanor changed during his affair with Cook.  She claims that he became increasingly distracted, angry, and irritable with her.  She also claims that Officer Chambers embarrassed her by rudely talking to her over the police radio.[6]  Griffin further testified that Officer Chamber's affair began to disrupt her daily work environment.  She claims that once a man cursed her over the phone and said that dispatcher Cook was with him and would not report to work.  Griffin, in fact, worked overtime that night to cover for Cook who was late reporting for her shift.   Over an hour late for work, Cook eventually phoned Griffin and told her that a man had abused her and prevented her from reporting to work.  A few minutes later, Officer Chambers entered the office patting his gun, saying, "That sorry son-of-a-bitch. I'm going to kill that mother-fucking man."  Apparently, Chamber's comment referred to the caller.  Another officer had to calm Chambers down.  Meanwhile, Cook finally reported to work with her eighteen-month-old child in tow.  Griffin claims that she remained on-duty for another forty-five minutes because Cook was hysterical and disheveled.

Due to these types of events, Griffin did not think that Officer Chambers and dispatcher Cook should work the same shift together.  Griffin also did not want to work with Cook again because she felt that Cook's affair was disrupting the work environment.  Griffin claims, however, that Chief Alexander was ambivalent about the perceived problem.  She claims, moreover, that Lt. Wiggs essentially told her to stay out of the matter.  In any event, at some point after Cook gave birth to Chamber's child, Chief Alexander removed Chambers as dispatcher supervisor and replaced him with Sgt. Lasseter.

Meanwhile, Griffin claims that other events stemming from Officer Chamber's affair were disruptive and caused her work situation to deteriorate.  Griffin claims that Officer Chambers' wife regularly disrupted her work by calling and coming to the station because she knew about

---

[5] Cook and Chambers allegedly admitted to Griffin that they were having an affair. At an employee meeting, Cook purportedly told Griffin that she was pregnant with Chamber's child. Cook claimed that Chambers had told her that he was going to leave his wife and marry Cook.

Griffin also alleges that supervisor/subordinate affairs were common-place at the police department. She claims that Officer Chambers told her that, among others, Captain Harvey Scales and dispatcher Kelli Lee were having an affair.

[6] The public could listen to these conversations.

3

her husband's infidelity. Griffin was also embarrassed once at a store when an individual mistakenly thought Griffin was pregnant with Chambers' child.

Despite her problems with Chambers' affair, Griffin sought Chambers' help in asking the Glencoe City Council to make her dispatcher position full time.[7]  Chambers refused but said that he earlier had "talked the council" into making Cook a full-time dispatcher.  Chambers explained that he had felt sorry for Cook because she was a single mother who was pregnant and without insurance at the time.  Griffin felt slighted because other dispatchers had worked for years before gaining full-time status, but Cook became full-time after only eight months.[8]

In August 1995, Griffin claims that she was due to become the next full-time dispatcher by virtue of the seniority system in place.  Kelli Lee's full-time position opened that month when she became the Glencoe City Clerk.  Instead of placing Griffin in the full-time position, the City gave Lee an unprecedented one-year leave of absence because Lee had been reluctant to become the Clerk with a new administration on the horizon that might replace her.  When Griffin asked Chief Alexander for the position vacated by Lee, he purportedly declined because he did not want to have to remove Griffin if Lee was replaced as Clerk and returned to the dispatcher position.[9] Griffin alleges that Lee initially received a full-time dispatcher position and later the City Clerk position because she was having an affair with Captain Scales.

In October 1995, Griffin began experiencing problems with her new supervisor, Sgt. Lasseter, when she refused to work shifts with Cook.  Apparently, Sgt. Lasseter's policy was to first offer overtime to the most senior dispatcher and then to the next dispatcher in seniority until someone agreed to work.  The next time that overtime was available, he would continue down the seniority line from the person who last worked.  More than once, Griffin refused Sgt. Lasseter's

---

[7] A full-time dispatcher worked more hours than a part-time dispatcher and received health insurance benefits.

[8] Glencoe contends that Officer Chambers had no decision making authority.  It further contends that Chief Alexander had recommended that all part-time dispatchers be made full-time positions, including Griffin.

[9] The City Clerk and Police Chief are appointed every four years.  Glencoe contends that the decision to leave Ms. Lee's dispatcher position open was made by the mayor and city council, with no input from Chief Alexander or Officer Chambers.  Ms. Lee was reappointed in October 1996, and her full-time dispatcher position was then filled.

4

overtime request because she would not work the same shift as Cook.[10]

On October 26, 1995, the station held a mandatory dispatcher meeting which the mayor attended.[11]  To open the meeting, the mayor purportedly said, "We're having this little meeting here today because of some certain people's holier-than-thou attitude."  Griffin claims that this comment was in reference to her complaints.  During his talk, the mayor apparently said that schedule changes were necessary due to complaints the department had received.  After the mayor left, Sgt. Lasseter ordered all gossiping to cease or else the gossiper would receive a written reprimand.  Lasseter threatened to fire the gossiper if the gossip continued despite the reprimand.  Lasseter further said that he would reprimand any dispatcher who refused to work an extra shift upon request.  He also threatened to fire any dispatcher who refused a request more than once.[12]  At that point, Griffin stood and said, "[Sgt. Lasseter], you might as well write me up now.  We've already discussed this, and I quit."[13]

After quitting, Griffin left the meeting.  She called the mayor the next day, however, to request her job back.  The mayor scheduled a meeting for November 1, 1995 with Griffin and the City Council.  At the meeting, Griffin explained that she had quit because she felt she had been sexually harassed.  She distributed copies of a police journal article concerning sexual harassment between law enforcement personnel.  Griffin asked the council to create a policy prohibiting

---

[10] Also at this time, she confronted Glencoe City Council Member Bren Riley and threatened to sue if the City did not correct the perceived problem with Chambers and Cook.  Riley promised Griffin that he would speak to the mayor about the situation.  The next day, Sgt. Lasseter phoned Griffin to tell her that he would no longer schedule Cook and Griffin for the same shift.

[11] Every dispatcher attended except the lone male dispatcher who the mayor did not require to attend.  The mayor purportedly told the male dispatcher, "I'll talk to you later in private."

[12] Griffin believed that these comments were directed toward her because Sgt. Lasseter had previously asked her three times to work a sixteen hour double shift to fill in for Cook.  Glencoe recites a slightly different version of the new overtime rule.  Glencoe contends that Lasseter's rule allowed a dispatcher to refuse an overtime shift once.  If contacted a second time, the dispatcher would be required to work the shift.

[13] Griffin claims that another incident during this time also supports her Title VII claims.  She claims that her overhead light did not work and that her work station was dark except for light from her computer screen.  Officer Chambers purportedly suggested that no one cared about Griffin's problem because she was not "sleeping around."  He further stated that if Griffin were sleeping around she would get a new light.  Apparently, Griffin worked without an overhead light for a week before the department fixed the problem.  She hung her own drop light over the dispatch table so that she could see.

5

supervisor/subordinate relationships in response to the perceived problems. Griffin also asked the council for her job back. The next morning the mayor phoned Griffin and scheduled a meeting at Chief Alexander's office. At the meeting, the mayor said that the Council would not adopt a new relationship policy but would reinstate Griffin to her previous job.[14] Griffin refused to return to her dispatcher job..

## ANALYSIS

### 1. Hostile Environment

Griffin contends that the purported harassment that she endured was so severe that it affected a term, condition, or privilege of her employment. The Supreme Court addressed the hostile work environment theory of sexual harassment in Harris v. Forklift System, Inc., 510 U.S. 17, 114 S. Ct. 367, 126 L. Ed.2d 295 (1993) explaining that an employer violates Title VII where "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . .'" Id. at ___, 114 S. Ct. at 370, 126 L. Ed.2d at 301 (internal citations omitted).

Griffin has not shown that she was subjected to intentional discrimination because of her sex in violation of Title VII. Even viewing the "totality of the circumstances" and resolving all reasonable inferences in her favor, Griffin's evidence is insufficient to establish harassment that was "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." The instances that Griffin cites as evidence of a sexually hostile work environment are the purportedly promiscuous environment, the lack of rules prohibiting relationships between supervisors and subordinates, the circumstances involving Officer Chambers' affair with dispatcher Cook, and the consequent stress imposed on her. These events, she contends, undermined her professional dignity and work ability. She contends, moreover, that

---

[14] Chief Alexander purportedly emphasized that Griffin should at least be happy that Cook and Officer Chambers would no longer work together. The mayor purportedly said, "Ms. Griffin, don't you realize that you can't impose your morals on other people?" Griffin replied that her morality was not at issue.

6

her supervisor, Chambers, did nothing to prevent reserve Officer Berry's harassment. Instead, she claims that he told her simply to ignore Berry. After viewing the evidence in its totality, however, the court concludes that no reasonable inference exists suggesting that the Glencoe police department had a sexually hostile working environment.

Initially, the court concludes that Officer Chambers' affair with another dispatcher was not sexual harassment of Griffin. The gist of a Title VII claim is that an <u>employee</u> is intentionally discriminated against because of <u>her</u> sex. To establish a claim for sexual harassment due to a hostile environment, therefore, the plaintiff must show that but for the fact of her sex, <u>she</u> would not have been the object of harassment. <u>Henson v. City of Dundee</u>, 682 F.2d 897 (11th Cir. 1982). Griffin correctly argues that Title VII does not require a female worker to be touched offensively or directly propositioned. The key element in that rule, however, is that <u>the employee</u> was subject to unwelcome *sexual harassment*. The Eleventh Circuit has defined sexual harassment as "sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature . . . ." Griffin's allegations that her work was disrupted and that she suffered added stress due to Officer Chamber's affair does not establish that she was discriminated against because she is female or that any alleged harassment was based on <u>her</u> sex. No evidence exists, moreover, connecting the affair to harassment of Griffin, other than Griffin's subjective belief.

Griffin's remaining hostile environment evidence consists of incidents involving Officer Berry and Council Member White. This evidence establishes discrete and unrelated incidents. Isolated incidents such as Griffin cites are not sufficiently severe or pervasive to create an atmosphere permeated with sexual hostility.[15]

Griffin relies heavily on <u>Broderick v. Ruder</u>, 685 F. Supp. 269 (D.D.C. 1988) for the proposition that "A workplace permeated with off-duty relationships between co-workers and supervisors, as in the case at bar, can constitute a hostile work environment." This case is unpersuasive for several reasons. In <u>Ruder</u>, the plaintiff worked as a staff attorney for the Securities Exchange Commission where she alleged a sexually hostile environment existed. The

---

[15] Griffin submits no evidence that anyone other than she knew of Council Member White's purported conduct. As to Officer Berry's conduct, Griffin claims that she told Officer Chambers who at one point was Assistant Police Chief. The evidence also established, however, that Berry stopped his offensive behavior when Griffin asked him to. Incidentally, Berry's conduct ended the same night that Griffin told Chambers.

7

plaintiff recited numerous incidents of sexual harassment by her co-workers and supervisors that included: a Regional Administrator who untied plaintiff's sweater and kissed her; the Regional Administrator and Regional Trial Counsel making sexually suggestive remarks about plaintiff's dress and figure;[16] a branch chief who admittedly had a "direct impact" in favorable evaluations received by an employee with whom he had an ongoing sexual relationship; circumstantial evidence of another female employee who received three promotions in slightly more than two years from a supervisor who, extensive evidence established, was noticeably attracted to and extensively socialized with the employee during business hours. Ruder, 685 F. Supp. at 1273-75. Substantiated evidence also showed that numerous supervisors were having affairs with subordinates. Id. This evidence was a mere portion of the evidence that convinced the court that the offending conduct was common knowledge throughout the workplace and created a hostile work environment. Id. at 1275.

Significant and obvious differences distinguish the present facts from those in Ruder. Noticeably, the plaintiff in Ruder established that her superiors physically harassed her and other female employees because of their sex - that is, touched and kissed them against their will. The court disagrees, moreover, that Ruder stands for the rule, as Griffin contends, that a workplace permeated with off-duty relationships between co-workers and supervisors can constitute a hostile work environment. Ruder stands instead for the rule that "evidence of the general work atmosphere, involving employees other than the plaintiff, is relevant to the issue of whether there existed an atmosphere of hostile work environment which violated Title VII." Ruder, 685 F. Supp. at 1277 (citing Vinson v. Taylor, 753 F.2d 141, 146 (D.C. Cir. 1985), *aff'd in relevant part and rev'd in part*, 477 U.S. 57, 106 S. Ct. 2399, 91 L. Ed.2d 49 (1986)). Such evidence is relevant because "even a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere in which such harassment was pervasive." Ruder at 1278. Although evidence exists here showing that consensual supervisor/subordinate relationships were apparently tolerated, no evidence exists of pervasive sexual harassment.

---

[16] The evidence established that these individuals similarly harassed other employees.

8

Title VII was not designed to improve the morality of the workplace. Not all matters that touch the perimeters of human sexuality in the workplace are covered by the statute. Congress instead intended to protect employees from having to endure work environments that are openly antagonistic toward members of a particular gender. Conduct that is offensive, and often disruptive, therefore, does not violate the statute's provisions if it is not hostile because of an employee's gender.

## 2. Quid Pro Quo

Quid pro quo sexual harassment occurs when an employer alters an employee's job conditions because of the employee's refusal to submit to sexual demands. Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 106 S. Ct. 2399, 91 L. Ed.2d 49 (1986); Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1315 (11th Cir. 1989). In other words, Title VII prohibits an employer from requiring sexual consideration from an employee as a *quid pro quo* for job benefits. Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1564 (11th Cir. 1987). To establish a prima facie case of *quid pro quo* sexual harassment against an employer, the employee must prove: (1) that the employer belongs to a protected group, (2) that the employee was subject to unwelcome sexual harassment, (3) that the harassment complained of was based on sex, and (4) that the employee's reaction to the harassment affected tangible aspects of the employee's compensation, or terms, conditions, or privileges of employment. Sparks, 830 F.2d at 1564.

The court concludes that Griffin was not a victim of *quid pro quo* sexual harassment. Griffin's evidence of such harassment includes the incident with Council Member White. This evidence, and all reasonable inferences drawn from it, does not establish that Council Member White conditioned job benefits upon Griffin submitting to sexual acts with him. The essence of a *quid pro quo* claim is that job benefits are tied to submission to unwanted sexual conduct. The issue is not whether a deed or statement is harassing but whether the harasser has linked concrete benefits to toleration of sexual conduct. Although the evidence tends to establish that Council Member White's actions offended Griffin, the evidence falls short of showing that White conditioned job benefits on Griffin's submitting to such conduct.

Griffin's remaining evidence of *quid pro quo* harassment involves Officer Chambers

9

purportedly refusing to ask the Glencoe City Council to make her a full-time dispatcher, despite purportedly doing so for Cook with whom he was having an affair. His refusal, Griffin contends, shows that the department favored dispatchers who succumbed to their supervisor's sexual advancements.[17] Griffin claims that her assertion is borne out by Chambers' and Lt. Wiggs' suggestion that the City had made dispatcher Lee full-time, moved her to the City Clerk position, and then gave her a year leave-of-absence because of her relationship with Captain Harvey Scales. Griffin claims, moreover, that she was due to receive Lee's vacated position based on the seniority system but did not receive it because she was not sexually involved with anyone at the station.

Other than Griffin's unsupported allegation, no evidence exists that anyone connected with the City of Glencoe conditioned job benefits to the acceptance or rejection of sexual proposals. The undisputed evidence establishes, moreover, that the mayor and city council had the final authority to make employment decisions concerning the police department. Officer Chambers never said that he could help Griffin obtain a full-time dispatcher position. In any event, Griffin has not shown how Chambers tied any assistance to sexual demands. Without such evidence, a *quid pro quo* claim must fail. Accordingly, summary judgment will be granted on this claim.

### 3. Retaliation and Constructive Discharge

Title VII prohibits an employer from discriminating against an employee because the employee has opposed any practice made an unlawful employment practice, or because the employee has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing. See 42 U.S.C. § 2000e-3(a). To state a prima facie case of retaliation under the first part of this standard, the employee must establish: (1) that she engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding, (2) was disadvantaged by an action of the employer simultaneously with or subsequent to such opposition or participation, and (3) that there is a causal connection between the protected activity and the

---

[17] She claims that her conclusion is supported by Chamber's suggestion that she could only receive a new light for her workstation if she slept with someone.

10

adverse employment action. Morgan v. City of Jasper, 959 F.2d 1542, 1547 (11th Cir. 1992).

Griffin contends that many retaliatory events forced her constructive discharge. First, she contends that the events at her reinstatement meeting with the City Council compelled her to resign. Second, she contends that the department's new rules prohibiting gossip could be construed as a retaliatory response by the department to her complaints. Third, Griffin claims that Sgt. Lasseter designed his new "call-in" shift policy in retaliation against her because she had refused to work various shifts with Cook. Fourth, she contends that she was accused of having a holier-than-thou attitude and of being a troublemaker. Fifth, she notes that the Council offered to reinstate her to a dispatcher but only "under the same conditions as existed before."

Griffin does not point to any unlawful employment practice that singles her out for adverse treatment. Even were the court to view the evidence as retaliatory against Griffin for opposing what she felt were unlawful employment actions, the City of Glencoe had a legitimate reason for its employment action -- an orderly functioning work environment. This reason is legally sufficient to rebut any presumption of retaliation. That the City may have been slow to correct certain disruptive events does not diminish the legitimacy of those actions. The burden now shifts to Griffin to either: (1) persuade the court that it was more likely that a discriminatory reason motivated the City of Glencoe; or (2) show that the City's tendered explanation was pretextual. Griffin has not presented evidence that the City of Glencoe adopted new employment practices as a pretext to cover otherwise unlawful employment practices directed toward her. Griffin has thus failed to carry her burden of proof and summary judgment will be entered accordingly on her retaliation claims.

Griffin also asserts a constructive discharge claim. In Kilgore v. Thompson & Brock Management, Inc., 93 F.3d 752 (11th Cir. 1996), the Eleventh Circuit recently affirmed a district court's order granting summary judgment on a constructive discharge claim and, in doing so, confirmed the narrow limits of such claims. To prevail in a constructive discharge claim, the employee must prove that her working conditions were so intolerable and onerous that a reasonable person in her position would have felt compelled to resign. E.g., Kilgore, 93 F.3d at 754. The Eleventh Circuit has traditionally required a high degree of deterioration in an employee's working conditions to show constructive discharge. Hill v. Winn-Dixie Stores, Inc.,

11

934 F.2d 1518, 1527 (11th Cir. 1991). A constructive discharge will generally not be found if the employee does not give the employer sufficient time to remedy the situation. <u>Kilgore</u>, 93 F.3d at 754.

Griffin also contends that the lack of a sexual harassment policy at the police department contributed to her constructive discharge. The Eleventh Circuit has ruled that "[p]art of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast." <u>Garner v. Wal-Mart Stores, Inc.</u>, 807 F.2d 1536, 1539 (11th Cir. 1987). The court concludes that Griffin did not act as a reasonable employee in resigning and that the City of Glencoe did not make her working conditions deliberately intolerable. Griffin has submitted no evidence that anyone deliberately sought to force her resignation or attempted to alter her job in any way - a prerequisite for a finding of constructive discharge. A mere unpleasant or difficult work environment is insufficient to support such a finding. Though particular individuals apparently did not conduct themselves in an exemplary manner, such incidents do not rise to the level of a determined attempt to force her resignation. Instead of resigning, Griffin could have returned to work as offered by the City Council. Griffin, however, emphasizes that the Council offered to reinstate her under "the same conditions as existed before she resigned." Apparently, Griffin felt that the City offered her reinstatement to a job under conditions violative of Title VII. The court disagrees. The evidence establishes only that the City offered to reinstate Griffin to her position and that the City refused to initiate a formal policy prohibiting supervisor/subordinate relationships. Although Griffin was frustrated, and the City may not have handled the situation perfectly, these events did not create a situation so deliberately intolerable that a reasonable person would have felt compelled to resign.[18] The defendant's motion will be Granted.

This ___24___ day of April, 1997.

---

[18] <u>See</u> <u>Boze v. Branstetter</u>, 912 F.2d 801, 804-805 (5th Cir. 1990).

12

Robert B. Propst
Senior United States District Judge

13